No. 18-86C
(Judge Charles F. Lettow)

———————————————————————————————

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————————————————————————

DZSP 21, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

v.

FLUOR FEDERAL SOLUTIONS, LLC,

Defendant-Intervenor.

———————————————————————————————

DEFENDANT'S MOTION FOR JUDGMENT UPON
THE ADMINISTRATIVE RECORD, MOTION TO STRIKE,
AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR
JUDGMENT UPON THE ADMINISTRATIVE RECORD AND
MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

———————————————————————————————

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:                                 DOUGLAS K. MICKLE
                                            Assistant Director
RICHARD J. HUBER, Esq.
PATRICIA J. BATTIN, Esq.                    VERONICA N. ONYEMA
Department of the Navy                      Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division
                                            Commercial Litigation Branch
                                            P.O. Box 480
                                            Ben Franklin Station
                                            Washington, D.C. 20044
                                            Telephone:  (202) 353-0536

February 26, 2018                           Attorneys for Defendant

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES...................................................................................................... iv

ISSUES PRESENTED ............................................................................................................ 2

STATEMENT OF THE CASE ............................................................................................... 2

   I.  Nature Of The Case................................................................................................... 2

   II. Statement Of Facts ................................................................................................... 3

       A.         Solicitation No. N62742-13-R-1150......................................................... 3

       B.         Evaluation Factors .................................................................................. 4

            1.     Cost Factors................................................................................. 4

            2.     Non-cost Factors ......................................................................... 4

       C.         The Guam Registered Apprenticeship Program ......................................... 6

       D.         First Evaluation And First GAO Protest...................................................... 6

       E.         Revised Proposals, Second Evaluation, And Second GAO Protest............ 8

       F.         Third Evaluation And Third GAO Protest.................................................. 9

       G.        Final Evaluation And Fourth GAO Protest............................................... 13

            1.     The Navy Restructures Its Evaluation Process .................................. 13

            2.     Final CET Evaluation......................................................................... 13

            3.     Final Source Selection Decision ........................................................ 16

            4.     Fourth GAO Protest And Current Proceedings................................... 18

SUMMARY OF ARGUMENT................................................................................................ 18

ARGUMENT ......................................................................................................................... 20

   I.  Standard Of Review ................................................................................................. 20

i

A.         Standard Of Review For Procurement Challenges Generally .................. 20

B.         Standard Of Review For Judgment Upon The Administrative Record .... 22

II.    The Navy Is Not Required To Revise The Solicitation ................................................ 22

   A.         DZSP's Claim Is Not Ripe......................................................................... 23

   B.         DZSP's Claim Is Also Waived ................................................................. 24

   C.         DZSP's Claim Also Fails On The Merits Because The Navy's
              Requirements Have Not Changed.............................................................. 26

III.   The Navy's Decision To Award The Contract To Fluor Was Rational...................... 30

   A.         The Navy Properly Evaluated Fluor's Proposal And Awarded
              It A Strength For Its Plan To Retain The Incumbent Workforce ............ 31

       1.        The Navy Understood Fluor's Proposal................................................ 31

       2.        Even If The Navy Erred, DZSP Cannot Demonstrate Prejudice....... 35

   B.         The Navy Properly Determined That DZSP's Proposed Costs Related
              To Its Replacement Plan Were Unrealistic ............................................. 39

       1.        The SSA Conducted A Thorough Evaluation Of DZSP's Plan ......... 39

       2.        The SSA Was Not Bound By The Findings Of The TET.................. 41

   C.         The Navy Did Not Evaluate DZSP and Fluor's Staffing Proposals
              Unequally................................................................................................ 44

   D.         The Navy Was Not Required To Normalize The Offerors' Application
              Of The GRAP Credit To The Guam GRT ............................................... 45

       1.        DZSP's Claim Fails On The Merits .................................................... 45

       2.        DZSP Has Waived This Argument As A Matter Of Law.................. 47

IV.   DZSP Has Not Demonstrated That It Is Entitled To Permanent Injunctive
    Relief ................................................................................................................ 48

V.   The Court Should Deny DZSP's Motion To Supplement The Administrative
    Record And Should Further Strike All References To These Documents From
    DZSP's Brief...................................................................................................... 50

CONCLUSION ............................................................................................................................. 54

# **TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*Aero Corp., S.A. v. United States,*
    38 Fed. Cl. 237 (1997) ................................................................................................ 50

*Ala. Aircraft Indus., Inc.-Birmingham v. United States,*
    586 F.3d 1372 (Fed. Cir. 2009).................................................................................. 46

*Allied Materials & Equip. Co. v. United States,*
    81 Fed. Cl. 448 (2008) ................................................................................................ 29

*AgustaWestland N. Am., Inc. v. United States,*
    No. 2017-1082, 2018 U.S. App. LEXIS 1602, (Fed. Cir. Jan. 23, 2018) ................................ 52

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 (Fed. Cir. 2009).................................................................. 51, 52, 53

*Bannum, Inc. v. United States,*
    56 Fed. Cl. 453 (2003) ................................................................................................ 23

*Bannum, Inc. v. United States,*
    404 F.3d 1346 (Fed. Cir. 2005)............................................................ 21, 22, 35, 38

*BayFirst Solutions LLC v. United States,*
    102 Fed. Cl. 677 (2012) .............................................................................................. 37

*Blue & Gold Fleet, L.P. v. United States,*
    492 F.3d 1308 (Fed. Cir. 2007)........................................................................ 25, 29, 48

*Caddell Constr., Co. Inc. v. United States,*
    111 Fed. Cl. 49 (2013) ........................................................................................ 51, 52

*Ceres Envtl. Servs. v. United States,*
    97 Fed. Cl. 227 (2011) ................................................................................................ 46

*Ceres Gulf, Inc. v. United States,*
    94 Fed. Cl. 303 (2010) ................................................................................................ 38

*Cincom  Sys., Inc. v. United States,*
    37 Fed. Cl. 266 (1997) ................................................................................................ 48

*Cincom Sys., Inc. v. United States,*
    37 Fed. Cl. 663 (1997) ........................................................................................ 21, 44

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971), *overruled on other grounds by Califano v. Sanders*,
  430 U.S. 99 (1977)....................................................................................... 21

*Coastal Int'l Sec. v. United States*,
  93 Fed. Cl. 502 (2010) .............................................................................. 42

*Comint Systems Corp. v United States*,
  700 F.3d 1377 (Fed. Cir. 2012)................................................................. 25

*Computer Scis. Corp. v. United States*,
  51 Fed. Cl. 297 (2002) .............................................................................. 43

*CW Gov't Travel, Inc. v. United States*,
  110 Fed. Cl. 462 (2013) ............................................................................ 49

*CWT/Alexander Travel, Ltd. v. United States*,
  78 Fed. Cl. 486 (2007) .............................................................................. 28

*Data Gen. Corp. v. Johnson*,
  78 F.3d 1556 (Fed. Cir. 1996).................................................................. 35

*Day & Zimmermann Servs. v. United States*,
  38 Fed. Cl. 591 (1997), *appeal dismissed*, 132 F.3d 49 (Fed. Cir. 1997)................................ 38

*E.W. Bliss Co. v. United States*,
  77 F.3d 445 (Fed. Cir. 1996)..................................................................... 30

*eBay, Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006).................................................................................. 49

*FCN, Inc. v. United States*,
  115 Fed. Cl. 335 (2014) ............................................................................ 30

*Femme Comp Inc. v. United States*,
  83 Fed. Cl. 704 (2008) .............................................................................. 37

*Florida Power & Light v. Lorion*,
  470 U.S. 729 (1985).................................................................................. 22

*Gulf Group, Inc. v. United States*,
  61 Fed. Cl. 338 (2004) ......................................................................... 41, 42

*Halifax Technical Servs. v. United States*,
  1 Wage & Hour Cas. 2d (BNA) 1611 (D.D.C. Apr. 7, 1994) ................................. 38

*Honeywell Tech. Solutions, Inc., Wyle Labs, Inc.*, B-292354,
    Sept. 2, 2003, 2005 CPD ¶ 107 ............................................................... 44

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
    238 F.3d 1324 (Fed. Cir. 2001) ............................................................... 21

*Info. Scis. Corp. v. United States*,
    73 Fed. Cl. 70 (2006) ............................................................................... 43

*JWK Int'l Corp v. United States*,
    49 Fed. Cl. 371 (2001) ............................................................................. 46

*Kentron Haw., Ltd. v. Warner*,
    480 F.2d 1166 (D.C. Cir. 1973) ............................................................... 21

*L-3 Commc'ns EOTECH, Inc. v. United States*,
    87 Fed. Cl. 656 (2009) ............................................................................. 52

*Labat-Anderson, Inc. v. United States*,
    50 Fed. Cl. 99 (2001) ......................................................................... 46, 47

*Lermer Germany GmbH v. Lermer Corp.*,
    94 F.3d 1575 (Fed. Cir. 1996) ................................................................. 48

*Lions Raisins, Inc. v. United States*,
    51 Fed. Cl. 238 (2001) ............................................................................. 22

*M.W. Kellogg Co., v. United States*,
    10 Cl. Ct. 17 (1986) ........................................................................... 21, 44

*Magnum Opus Techs., Inc. v. United States*,
    94 Fed. Cl. 512 (2010) ............................................................................. 49

*Mil-Mar Century Corp. v. United States*,
    111 Fed. Cl. 508 (2013) ........................................................................... 46

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................................................. 48

*Murakami v. United States*,
    46 Fed. Cl. 731 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005) ............... 52

*NVE, Inc. v. United States*,
    121 Fed. Cl. 169 (2015) ........................................................................... 25

*OAO Corp. v. United States,*
    49 Fed. Cl. 478 (2001) .......................................................................................... 49

*Omega World Travel, Inc. v. United States,*
    54 Fed. Cl. 570 (2002) .......................................................................................... 42

*Overstreet Electric Co., Inc. v. United States,*
    59 Fed. Cl. 99 (2003) ............................................................................................ 41

*Per Aarsleff A/S v. United States,*
    829 F.3d 1303 (Fed. Cir. 2016) ...................................................................... 25, 52

*PGBA, LLC v. United States,*
    389 F.3d 1219 (Fed. Cir. 2004) ............................................................................ 48

*Savantage Fin. Servs., Inc. v. United States,*
    595 F.3d 1282 (Fed. Cir. 2010) ...................................................................... 27, 30

*SKF USA Inc. v. United States,*
    630 F.3d 1365 (Fed. Cir. 2011) ...................................................................... 29, 30

*Spherix, Inc. v. United States,*
    62 Fed. Cl. 497 (2004) .......................................................................................... 48

*Tech Systems, Inc. v. United States,*
    50 Fed. Cl. 216 (2001) .......................................................................................... 22

*Texas Bio- & Agro-Defense Consortium v. United States,*
    87 Fed. Cl. 798 (2009) .......................................................................................... 23

*Texas v. United States,*
    523 U.S. 296 (1998) .............................................................................................. 23

*Transatlantic Lines, LLC v. United States,*
    122 Fed. Cl. 624 (2015), *aff'd,* 644 F. App'x. 1024 (Fed. Cir. 2016) ................................ 41, 42

*Vitro Corp.,* B-247734.3,
    September 24, 1992, 92-2 CPD ¶ 202, 1992 U.S. Comp. Gen. LEXIS 1050, ................... 38, 45

*Westech Int'l., Inc. v. United States,*
    79 Fed. Cl. 272 (2007). ........................................................................................ 46

*Winter v. Nat'l Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................................. 27

*Wit Assocs., Inc. v. United States*,
   62 Fed. Cl. 657 (2004) ............................................................................................... 27

*Zenith Radio Corp. v. United States*,
   710 F.2d 806 (Fed. Cir. 1983).......................................................................... 48, 49

**Statutes**

5 U.S.C. § 702 ....................................................................................................... 21

5 U.S.C. § 706 ....................................................................................................... 21

10 U.S.C. § 2304 ................................................................................................... 49

28 U.S.C. § 1491 ............................................................................................ 21, 49

**Rules**

RCFC 52.1 ......................................................................................................... 1, 22

**Regulations**

48 C.F.R. § 16.301-2............................................................................................ 28

FAR 15.101-1 ....................................................................................................... 36

FAR 15.308............................................................................................................ 42

FAR 15.404-1 ................................................................................................. 38, 44

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

DZSP 21, LLC,                          )

        Plaintiff,          )

v.                                     )

THE UNITED STATES,                     )

        Defendant,          )      No. 18-86C

                   )      (Judge Charles F. Lettow)

        and                 )

FLUOR FEDERAL SOLUTIONS, LLC,  )

        Defendant-Intervenor.   )

### DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD, MOTION TO STRIKE, AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court grant the United States judgment upon the administrative record and deny the motion of plaintiff, DZSP 21, LLC (DZSP), for judgment upon the administrative record. DZSP has failed to demonstrate that the decision of the Department of the Navy (Navy) to award Solicitation No. N62742-13-R-1150 to Fluor Federal Solutions, LLC (Fluor) was unreasonable, arbitrary and capricious, or the result of prejudicial violation(s) of statute or regulation. We also request that the Court deny DZSP's motion to supplement the administrative record with documents related to its bridge contracts, and further request that the Court strike all references to these documents from DZSP's brief.

**ISSUES PRESENTED**

1.      Whether the Navy should be required to revise the solicitation for this cost-reimbursement contract in light of the passage of time and alleged fluctuation in requirements, as purportedly evidenced by DZSP's work on its bridge contracts.

2.      Whether the Government is entitled to judgment upon the administrative record because the Navy acted in accordance with the law when it awarded the contract to Fluor.

3.      Whether the Court should deny DZSP's request to supplement the administrative record with numerous contract administration documents related to its bridge contracts.

**STATEMENT OF THE CASE**

**I.      Nature Of The Case**

DZSP asserts four separate grounds in its protest challenging the Navy's award of Solicitation No. N62742-13-R-1150 for military base operations support to Fluor.  *See generally* ECF. No. 39 (Pl. Mem.)  *First*, DZSP argues that the Navy should revise the solicitation because, in its view, the Government's requirements have changed.  *Second*, DZSP argues that the Navy improperly evaluated Fluor's proposal because it failed to consider the risk that Fluor would not be able to retain the incumbent workforce.  *Third*, DZSP argues that the Navy improperly determined that DZSP's plan to replace incumbent workers with lower-cost workers was unrealistic.  *Fourth*, DZSP argues that the Navy failed to normalize offerors' application of credits for the Guam Registered Apprenticeship Program (GRAP) to the Guam Gross Receipts Tax (GRT) when evaluating proposals.

Each protest ground lacks merit.  Notably, DZSP's newly-minted argument that the Navy should be required to revise the solicitation due to purported "seismic changes in the Nation's military stance" and increases in "volume and scope of work" under DZSP's bridge contracts is

2

waived given that DZSP never raised this issue with the Navy or Government Accountability

Office (GAO)—despite ample opportunity to do so before now.  For example, DZSP has known

since January 2017, following GAO's decision in Fluor's third protest, that the Navy would not

be accepting further proposal revisions but instead would reevaluate existing proposals before

issuing a new source selection decision.  Further, this new argument lacks merit because the

Navy's requirements have not changed—the awardee is still required to provide ***all*** base

operational support services under this cost-reimbursement contract.  Indeed, the solicitation

itself anticipated fluctuations in mission requirements.  The Court should reject DZSP's request

that it—rather that the United States Department of Defense—determine the Government's

needs as it relates to military operations.

Further, DZSP's remaining protest grounds challenging various aspects of the Navy's

evaluation were considered and properly denied by the GAO.  As demonstrated below, the

record supports this result.  We respectfully request that the Court deny DZSP's protest.

## II.     Statement Of Facts

### A.     Solicitation No. N62742-13-R-1150

On October 16, 2013, the Navy issued Solicitation No. N62742-13-R-1150 (solicitation)

for the Base Operations Support (BOS) contract.  Tab 194, AR27008.  The solicitation was for a

cost plus award fee/award options contract for a base period of 12 months (including a four-month

mobilization period), four 12-month option periods, and a potential for three additional 12-month

option periods.  AR27010; AR27027.  As set forth in the Performance Work Statement (PWS),

"[t]he purpose of this [BOS] contract is to provide integrated base operations services to the

Commander Joint Region Marianas (CJRM), Supported Components & Tenant Commands in

carrying out their missions."  Tab 8a, AR384.  The PWS also indicated that "[t]he Contractor

shall furnish all necessary qualified personnel, supervision, management, tools, materials, equipment, facilities, transportation, incidental engineering, and other items necessary to provide" a variety of services, including management and administration, port operations, ordnance, material management, facilities support, utilities, base support vehicles and equipment, and environment services. *Id.*

###### B.      Evaluation Factors

Section M of the solicitation stated that the "[b]est value selection shall be made to the responsible Offeror whose proposal, conforming to the solicitation, represents the best value and [is] most advantageous to the Government, cost and technical factors considered." Tab 194, AR27104. The solicitation further indicated that the proposals would be evaluated on a combination of cost and non-cost factors. *Id.*

###### 1.      Cost Factors

In regards to cost evaluation factors, the solicitation indicated that "[c]ost proposals will not be assigned an adjectival rating but shall be evaluated for completeness, cost reasonableness and cost realism." AR27104. Of relevance to this protest:

> Cost Realism will be evaluated based on the cost information provided in support of the offered costs to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; are consistent with the various elements of the Offerors technical proposal; and are neither excessive nor insufficient for the effort to be accomplished.

AR27105.

###### 2.      Non-cost Factors

The solicitation further identified the following non-cost evaluation factors:

| Factor A: Past Performance |
| --- |
| Factor B: Occupational Safety |

4

| Factor C: Staffing and Resources |
| Factor D: Technical Approach |
| Factor E: Small Business Utilization |

AR27105-27113.  In regards to the Staffing and Resources factor, proposals would be "evaluated

for adequacy to support proposed processes and methodologies, including [… each o]fferor's

ability to recruit and retain qualified local workforce and key personnel/managers."  AR27110.  In

regards to the Technical Approach factor, the solicitation indicated that "[o]fferors will be

evaluated on its understanding of, and approach to, accomplishing the complexity and magnitude

of the requirements set forth in the performance objectives/standards contained within the

[PWS,]" and further indicated that proposals "will be evaluated on the demonstration of an

efficient and effective technical approach to accomplishing the work and approach to mitigating

risks."  AR27111.  In addition, "[t]he evaluation will also include the Offerors approach to

handling surge/contingency operations and fluctuations in mission requirements."  *Id*.

For each non-cost factor, with the exception of past performance, the Navy would assign a

rating of outstanding, good, acceptable, marginal or unacceptable.  AR27114.  For past

performance, offerors would receive past performance relevancy ratings and confidence

assessments.  *Id*.  "All technical factors (Factors B, C, D, and E) when combined are of equal

importance to the performance confidence assessment (past performance) rating (Factor A)[.]"

AR27104.  Further, "all technical factors and the performance confidence assessment (past

performance) rating, when combined are approximately equal to cost[.]"  *Id*.  The solicitation

further explained that "[t]he non-cost/price evaluation factors B through E when combined are

equal in importance to the performance confidence assessment (past performance) rating (Factor

A)."  *Id*.  Finally, "[a]ll non-cost/price subfactors within a particular factor are considered of equal

importance." *Id.*

### C.     The Guam Registered Apprenticeship Program

Of relevance to this protest, Guam has a Guam Registered Apprenticeship Program (GRAP), where "[a]ny business that employs apprentices may receive a tax credit against its business privilege tax liability [*i.e.*, its gross receipts tax, or GRT] equal to 50 percent of all eligible costs paid or incurred by a program participant to train an apprentice." *See* U.S. Department of Labor, Employment and Training Administration, "Learn About Tax Credits," available at https://doleta.gov/OA/taxcredits.cfm.  "Eligible costs include direct wages and benefits of the apprentice, instructor costs, training costs and personal protective equipment costs." *Id*.  Thus, Guam tax law permits businesses that employ apprentices to receive a tax credit against the Guam Gross Receipts Tax (GRT) for costs they paid or incurred to train an apprentice.

The solicitation provided guidance to offerors as to how they should apply the Guam GRT for purposes of their costs.  In particular, the Navy received two questions related to the Guam GRT prior to the receipt of proposals.  *See* Tab 8a, AR4252 (#90); *id.* at AR4269 (#140).  In response, the Navy advised offerors to apply a 4.0 percent Guam GRT to their total estimated cost plus total award fee.  *Id*.  The solicitation was silent regarding the effect of any GRAP credit on the Guam GRT.  *See generally* Tab 194, AR27008; Tab 8a, AR247 (conformed solicitation). Instead, the solicitation stated that "[a]ny questions concerning applicability or interpretation ["of Guam Territorial Law"] should be directed to Government of Guam, Department of Revenue and Taxation[.]"  Tab 194, AR27040.

### D.     First Evaluation And First GAO Protest

The Navy received eight proposals in response to the solicitation.  *See* Tab 20, AR6040 (discussing initial receipt of proposals).  As part of the evaluation process, the Navy convened a

████████████████████████████████████████████████████████

cost evaluation team (CET) as well as a separate technical evaluation team (TET).  *See*, *e.g*., Tab

8a, AR4544 (February 14, 2014 initial CET report); AR4667 (February 11, 2014 initial TET

report).   After conducting an initial evaluation, the Navy kept six offerors in the competitive

range, including DZSP, Fluor, and CKS-KBR Marianas Support Services, LLC (CKMS).

AR5143.  After requesting and receiving revised proposals, the Navy assigned the following

ratings and rankings to DZSP, Fluor and CKMS's proposals:

| Offeror | A | Overall B-E | B | C | D | E | Technical Rating | Total Cost | Overall Best Value |
|---------|---|-------------|---|---|---|---|------------------|------------|--------------------|
| **DZSP** | Substantial Confidence | O | O | O | G | O | 2 | $532.3M | 1 |
| **Fluor** | Substantial Confidence | O | O | O | O | O | 1 | ████ | 3 |
| **CKMS** | Substantial Confidence | O | O | G | O | O | 3 | ████ | 2 |

*See* Tab 8a, AR5405-5408.  On August 15, 2014, the Source Selection Authority (SSA) selected

DZSP for award.  *See* AR5422.

On September 26, 2014, CKMS filed a bid protest at GAO challenging various aspects of

the Navy's technical and cost evaluations.  Tab 1, AR1.[1]  Then, on September 27, 2014, Fluor

filed its initial protest, which primarily centered on its contention that the Navy's initial cost

realism evaluation led the agency to engage in misleading discussions with Fluor that ultimately

resulted in Fluor adding unnecessary additional costs to its proposal.  Tab 2, AR148.  On January

2, 2015, GAO sustained Fluor's protest and recommended that the Navy engage in limited

discussions with the offerors in the competitive range, solicit and receive revised proposals, and

issue a new source selection decision.  Tab 20, AR6039, AR6047.  On January 12, 2015, DZSP

sought reconsideration of GAO's decision, which GAO denied on July 22, 2015.  *See* Tab 21,

_____

[1] GAO denied CKMS's protest.  Tab 20, AR6046-47.

███████████████████████████████████████

AR6049; Tab 25, AR6098.

### E.      Revised Proposals, Second Evaluation, And Second GAO Protest

As a result of GAO's decision, on July 24, 2015, the Navy reopened discussions, issued

evaluation notices, and requested proposal revisions.  *See*, *e.g*., Tab 32, AR10342-10350.  On

October 27, 2015, DZSP and Fluor submitted revised proposals.  Tabs 148-149, AR20711-

22479.  During source selection, the Navy assigned the following ratings and rankings to DZSP

and Fluor's proposals:

| Offeror | A | Overall B-E | B | C | D | E | Technical Rating | Total Cost | Overall Best Value |
|---|---|---|---|---|---|---|---|---|---|
| **DZSP** | Substantial Confidence | O | O | O | G | O | 2 | $488.3M | 1 |
| **Fluor** | Substantial Confidence | O | O | O | O | O | 1 | ██████ | 2 |

*See*, *e.g*., Tab 58, AR11135-11137.  The Navy again awarded the contract to DZSP.  AR11141.

On December 21, 2015, Fluor filed a second GAO protest that primarily challenged the

Navy's cost realism analysis, as well as certain aspects of the agency's technical evaluation.  Tab

26, AR6106.  Fluor submitted a supplemental protest on January 29, 2016.  Tab 70, AR11346.

Of relevance to the current protest, Fluor contended that the Navy should have determined that

DZSP's formula for computing the Guam GRT was flawed, noting that it had used a figure of

approximately ████ percent to calculate the GRT, while DZSP had applied a GRT of four

percent.  AR11357; AR11378-11380; *see also* Tab 213, AR27500-27502 (GAO decision in

fourth protest discussing this aspect of Fluor's earlier protest).  In response, DZSP argued that

the Navy was not required to factor in the parties' adjusted rate to the GRT when conducting its

cost realism evaluation.  In particular, in its February 22, 2016 supplemental comments to GAO,

DZSP stated:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

> Fluor's final cost realism argument is that the Navy failed to correctly assess the realism of the Guam Gross Receipt Tax (GRT). *** Only through an exhaustive analysis of Fluor's application of the Guam apprenticeship program could the Navy have reverse-engineered the ▮▮▮▮ % rate. That level of analysis is far beyond any reasonable requirement for an agency's cost realism evaluation.

Tab 74, AR13419-13420 (internal citations omitted).

On March 25, 2016, GAO held an alternative dispute resolution conference, at which time GAO recommended that the Navy take corrective action regarding several aspects of the evaluation. *See* Tab 75, AR13432. In response, the Navy indicated that it would take corrective action to, among other things, "(1) ensure a cost adjustment is applied to reflect consistent application of Guam Gross Receipts Tax to all offerors and (2) address how DZSP's decrease in exempt labor rates would affect technical review of Factor C, Staffing and Resources, (key personnel/management) over the life of the contract and the effect if any to cost realism for exempt labor." *Id*.[2] The Navy also indicated that it would issue an amended Source Selection Decision Document. *Id*. As a result, on March 30, 2016, GAO dismissed the protest as academic. Tab 76, AR13434.

### F.    Third Evaluation And Third GAO Protest

Following the second GAO protest, on June 16, 2016, the SSA determined that DZSP and Fluor's proposals did not contain sufficient information regarding their exempt labor rates. Tab 88, AR13740.[3] As a result, on June 17, 2016, the Navy opened limited discussions with DZSP and Fluor. *See* Tabs 89 and 90, AR13742-13746.

---

[2] Exempt labor refers to those employees that are exempt from coverage of the Collective Bargaining Agreement. *See*, *e.g*., Tab 116, AR16662.

[3] The SSA also eliminated the four remaining offerors from the competitive range. *Id*.

███████████████████████████████████████████████████████████████████

As part of those discussions, the Navy requested that DZSP provide additional information regarding its exempt labor rates, and further asked DZSP to "explain your plan for workforce replenishment based upon particular exempt labor categories as you deem appropriate to justify your reduced exempt labor cost over the life of the contract." Tab 89, AR13742-13744. On June 24, 2016, DZSP responded that ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████ Tab 91, AR13747. DZSP further explained that its replacement plan would include a ██████ percent salary "decrement" for new employees that would ██████████████████████████████████████████

████████████████████████ and would, in turn, result in a ████████████████████████████ over the length of the eight-year contract. AR13748.[4]

The Navy also requested that Fluor adjust its GRT based on a downward probable cost adjustment, and further asked Fluor to address how it intended to source its proposed labor force in the event that it is not able to achieve a 95 percent incumbent workforce rate. Tab 90, AR13745. On June 27, 2016, Fluor provided its response as to how it intended to achieve its proposed retention rate. Tab 92, AR13750-13753. Fluor also stated that ██████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████ AR13751.

The Navy then requested revised proposals on or before July 29, 2016, and DZSP and

---

[4] In its response, DZSP used the term "decrement" to denote ████████████████████████

████████████████████████ AR13747. DZSP explained that this decrement factor ████████████████. AR13747-13748.

███████████████████████████████████████████████████████████

Fluor timely submitted their proposal revisions, which incorporated the parties' responses to the

Navy's June 2016 evaluation notices.  Tabs 99 and 100, AR13891-13894; *see also* Tabs 150 and

151, AR22480-25000 and Tab 237, AR28559 (July 29, 2016 DZSP and Fluor final proposal

revisions); Tab 91, AR13747 (DZSP's June 24, 2016 response to discussion questions); Tab 143,

AR17290 (same); Tab 92, AR13750 (Fluor's response to discussion questions); Tab 144,

AR17294 (same).  DZSP did not revise its technical proposal to account for its June 24, 2016

response to the Navy explaining its plan to replenish (i.e. replace) ███ percent of its workforce

at ██████████████████ each year. *Compare* Tab 91, AR13747 (information regarding

DZSP's plan to replace ████ percent of its incumbent workforce each year) *with* Tab 150b,

AR23459 (DZSP's July 29, 2016 final proposal revisions).  Instead, DZSP's final technical

proposal continued to indicate that it intended to use ███████████████████

███████████████████████████████████████████████████

Tab 150b, AR23537.  Moreover, DZSP continued to tout its high retention rates.  For example,

DZSP noted that its proposal addresses ████████████████████████████████

███████████████████████████████████ (bold in the

original).  AR23536.  Likewise, in Exhibit ES-1 identifying "key features and benefits" of its

proposal, DZSP again noted a ██████████████████ AR23492.

On July 22, 2016, the CET and TET each issued updated reports regarding their

respective evaluations of the offerors' cost and technical proposals.  Tab 105, AR13902 (CET

Memo to File); Tab 106, AR13973 (TET Memo to File).  The CET determined that both DZSP

and Fluor's proposed costs were complete, reasonable and realistic.  Tab 105, AR13904.  Of

relevance to this protest, the TET determined that DZSP's ████ percent workforce replacement

plan was "very realistic[.]"  Tab 106, AR13986.  On July 25, 2016, the Source Selection

████████████████████████████████████

Evaluation Board (SSEB) issued its report agreeing with both the ratings assigned by the TET, as

well as the CET's findings.  Tab 107, AR14024.  Then, on July 28, 2016, the Source Selection

Advisory Council (SSAC) issued its report recommending DZSP for award.  Tab 108, AR14038.

The SSAC assigned the following ratings and rankings to DZSP and Fluor's proposals:

| Offeror | A | Overall B-E | B | C | D | E | Technical Rating | Total Cost | Overall Best Value |
|---|---|---|---|---|---|---|---|---|---|
| **DZSP** | Substantial Confidence | O | O | O | G | O | 2 | $491.9M | 1 |
| **Fluor** | Substantial Confidence | O | O | O | O | O | 1 | $494.5M | 2 |

*See* Tab 108, AR14027-14029.  On August 10, 2016, the SSA again awarded the contract to

DZSP.  Tab 110, AR14049 (SSA decision).

On October 11, 2016, Fluor filed its third GAO protest.  Tab 79, AR13449.  In its

comments on the agency report, Fluor contended that the Navy engaged in disparate treatment

when evaluating Fluor and DZSP's proposal in the area of staff recruitment and treatment.  *See*

Tab 114, AR16636.  On January 28, 2017, GAO sustained the protest, determining that "the

agency's evaluators and source selection authority expressed a concern that Fluor would be

unable to recruit the incumbent exempt employees at the wage rates it had proposed[;]" however,

"[i]n contrast, the evaluators did not give meaningful consideration to similar implications of

DZSP's proposed approach [of replacing incumbent workers at a rate of ███ percent of its

exempt workforce per year ███████████████ or how it would impact the firm's

retention of employees[.]"  Tab 116, AR16666.  GAO recommended that the Navy reevaluate

proposals and make a new source selection decision.  AR16668.

G.     **Final Evaluation And Fourth GAO Protest**

1.     **The Navy Restructures Its Evaluation Process**

After the third GAO protest, the Navy did not request proposal revisions.  Instead, and because GAO's last decision identified errors regarding the thoroughness of the Navy's evaluation of the offerors' exempt labor rates, the Navy re-evaluated the existing proposals and made several significant changes to its evaluation process.  First, the Navy assigned a new SSA. *See* Tab 193, AR27007 (identifying new SSA).  Second, the Navy reconvened the CET to conduct a new, thorough review of both offerors' cost proposals as they relate to exempt labor rates.  *See* Tab 192, AR26969 (June 30, 2017 final CET report); *see also* Tab 213, AR27491 (GAO noted that the Navy's evaluation of "the offerors' exempt labor rates[]" was "the area of the agency's previous evaluation that our last decision identified as problematic.").

2.     **Final CET Evaluation**

On June 30, 2017, the CET issued its final report.  Tab 192, AR26969.  The CET first noted that the Navy had appointed a new Cost/Price Analyst to re-evaluate DZSP and Fluor's proposals.  *Id*.  The CET further explained that its re-evaluation focused on the offerors' Factor C Staffing and Resource proposals as they impacted cost—more specifically, exempt labor rates. AR26971.  Of relevance to this protest, the CET evaluated DZSP's replacement plan, which it submitted as part of its cost proposal.  This plan proposed to replace ▮▮▮ percent of DZSP's exempt labor categories each contract period based on retirements and other attrition, and further proposed to achieve a ▮▮▮▮▮▮▮▮▮▮ in exempt labor rates over the life of the contract. AR26971; *see also* Tab 91, AR13747 (DZSP's June 24, 2016 replacement plan).  This ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in exempt labor compensation was apparently the product of a ▮▮▮▮▮▮ in compensation for the new hires combined with a ▮▮▮▮▮▮ escalation each year

████████████████████████████████████████████████████

for personnel not replaced.  Tab 91, AR13748.

        The CET determined that DZSP's plan was not reasonable or realistic because (1) it was

inconsistent with DZSP's technical proposal and available historical data as the incumbent; and

(2) DZSP failed to offer adequate support or justification for its departure from its past practice.

Tab 192, AR26972-26973.  In particular, ████████████████████████████████████

███████████████████████████████████████████████.  AR26973; *see also*

Tab 150, AR22480 (DZSP's technical proposal for its July 2016 final proposal revisions).  ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████  Tab 192, AR26973; *see also* Tab 150b, AR23536-

23538.  ██████████████████████████████████████████████

█████████████████████████████████.  Tab 150b, AR23492, AR23536-

23538.  Thus, the CET determined, "DZSP did not provide any meaningful cost or pricing data

to support ████████████████████████████████████████████

████████████████████████████████  Tab 192, AR26973 (emphasis

in original removed).  The CET further noted that DZSP failed to "provide support or

justification for ██████████████████████████████████████

██████████████████████████  *Id*.  Further, DZSP failed to offer support for its

proposed █ percent decrement.  AR26973-26974.  For those reasons, "there [wa]s a substantial

risk" that DZSP would be unable to achieve its proposed ████████████ in exempt labor

rates over the life of the contract.  AR26974.

        As a result, and in order to account for an increase in exempt labor costs, the CET

████████████████████████████████████████████████

applied an upward cost adjustment of ████████ to DZSP's total contract price.  AR26975.[5]

Although the CET reviewed historical exempt labor rates from DZSP's bridge contracts, which

reflected increases between years 2013 and 2016 ranging from 2.8 to 6.7 percent, the CET did

not apply these rates given the "numerous changes in employees, job categories, and the quantity

of positions proposed[,]" and furthered explained that because the bridge contracts were each

only awarded for six months, they could reflect an "upward pressure on wages due to uncertainly

with employment."  AR26974-26975.  Instead, the CET applied a more conservative 1.29

percent escalation rate to DZSP's proposed exempt labor rates based on an eight-year average of

Guam Bureau of Statistics Consume Price Index (CPI) for years 2009 through 2016.  AR26976.

The CET reasoned that "a multi-year trend is a reasonable basis for projections" and further

explained that "[t]he use of a longer-term data set takes into account high/low years and levels

out the overall trend."  AR26977.

In regards to Fluor, the 2017 CET noted that the 2016 CET had determined that Fluor's

proposed labor rates were realistic, and it agreed with this determination.  AR26978.  In

particular, the 2017 CET indicated that in response to the Navy's June 2016 discussion question,

Fluor indicated that if it was unable to ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  AR26978 (citing Tab 92, AR13751).  The CET determined that

Fluor's "approach satisfactorily addressed any recruitment and retention concerns because

████████████████████████████████████████████████

---

[5] The CET also made an upward adjustment to both DZSP and Fluor's proposal to account for a revised start date of September 1, 2017.  *See* Tab 192, AR26971-26972 (applying an additional ████████ to DZSP's proposal and ████████ to Fluor's proposal).  This separate adjustment is not at issue in this protest.

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ AR26978.  Thus, the CET reasoned, ██████████████

████████████████████████████████████████ *Id.*

### 3.     Final Source Selection Decision

On July 14, 2017, the SSA determined that Fluor's proposal provided the best value to

the Government and that the contract should be awarded to Fluor.  Tab 193, AR26984.  In

reaching this decision, the SSA considered the SSAC's July 2016 evaluation report, the SSEB's

July 2016 report (which reviewed the 2016 findings of the CET and TET), as well as the CET's

June 2017 report.  AR26984; *see also* Tab 189, AR26943 (July 2016 SSEB report); Tab 190,

AR26945 (July 2016 SSAC Report); Tab 192, AR26969 (June 2017 CET Report).  The SSA

also conducted her own, independent evaluation of DZSP and Fluor's July 2016 final proposal

revisions.  *See* AR26988 ("My evaluation of the non-cost/price and cost proposals of July 2016

(FPR) considered the qualitative value and impact of the strengths and weaknesses.").

In regards to the cost evaluation factor, the SSA agreed with the CET's determination

that DZSP's replacement plan was not reasonable or realistic because it was inconsistent with

DZSP's technical proposal and historical data, and also because DZSP failed to provide support

for its ability to ████████████████████████████████.  Tab 193, AR26988-

26989.  As a result, the SSA adopted the CET's upward adjustment of DZSP's total adjusted cost

to ██████████.  *See* AR26986.  In regards to the non-cost factors, the SSA awarded DZSP a

"Substantial Confidence" rating for past performance, and awarded it a rating of "Outstanding"

for all other non-factors with the exception of Factor D, Technical Approach, where DZSP

received a rating of "Good."  *See* AR26986; AR26989-26997.  Of relevance to this protest, for

Factor C, Staffing and Resources, the SSA noted that although DZSP's cost proposal included a

████████████████████████████████████████████████████████████████

replacement plan that utilized a ████ percent annual replacement rate, she found this plan to be

unrealistic.  AR26995.  Accordingly, she did not downgrade DZSP's technical proposal in light

of the risks associated with the high employee turnover indicated in its cost proposal, but instead

████████████████████████████████████████████████████████████

████████████.  *Id*.  In light of the six strengths noted, and the absence of weaknesses and

deficiencies, DZSP received an "outstanding" rating for this non-cost factor.  *Id*.

        In regards to Fluor's proposal, the SSA concurred with the CET and determined that

Fluor's proposed cost for its exempt labor pricing was reasonable and realistic and, therefore,

adopted the CET's adjusted total cost of $495,891,094.  AR26997-26998.  The SSA also

awarded Fluor a "Substantial Confidence" rating for past performance, and awarded it an

"outstanding" for each remaining non-cost factor.  AR26986; AR26997-27005.  Of relevance to

this protest, for Factor C, Staffing and Resources, the SSA awarded Fluor a rating of

"Outstanding[.]"  AR27002-27003.  The SSA noted Fluor's intent to hire 95 percent of its

personnel from the incumbent workforce, and further stated that in response to questions from

the Navy, Fluor had indicated that if it was unable to achieve its proposed retention rate and

proposed compensation rates, ████████████████████████████████████████████

██████████████████████  AR27003.  As a result, the SSA determined that ██████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████.  *Id*.  The SSA awarded Fluor a strength

in this area, for a total of seven strengths under Factor C.  *Id*.  The SSA further identified the

following ratings and rankings for DZSP and Fluor's proposals:

███████████████████████████████████████

| Offeror | A | Overall B-E | B | C | D | E | Technical Rating | Evaluated Cost | Overall Best Value |
|---|---|---|---|---|---|---|---|---|---|
| **DZSP** | Substantial Confidence | O | O | O | G | O | 2 | ████ | 2 |
| **Fluor** | Substantial Confidence | O | O | O | O | O | 1 | $495.9M | 1 |

*See* Tab 193, AR26986-26987.

The SSA then conducted a best value analysis.  She noted that Fluor was ranked first technically and found that it had the stronger proposal for both Factors B and D, but further found that the offerors were essentially equal for the remaining non-cost factors.  AR27005-27006.  With respect to cost, the SSA noted that Fluor had the lowest evaluated cost, which was ████████ lower than DZSP's price.  AR27005.  Accordingly, the SSA ultimately determined that Fluor provided "the best value to the Government."  AR27006-27007.

### 4. <u>Fourth GAO Protest And Current Proceedings</u>

On October 3, 2017, DZSP filed its protest at GAO.  Tab 119, AR16854.  On November 2, 2017, the Navy filed the agency report, which included, among other things, evaluation notices, proposal revisions, source selection reports from the three earlier protests, and the updated source selection materials.  *See* Tabs 127 to 206, AR17039 through AR27269.  On January 10, 2018, GAO denied DZSP's protest.  Tab 213, AR27489.  This protest followed.

### <u>SUMMARY OF ARGUMENT</u>

The Court should reject DZSP's new argument—one that it never raised to either the Navy or GAO despite several years of evaluations and protests—that the Navy should be required to revise the solicitation in light of the passage of time and purported fluctuations in requirements.  The plain language of the solicitation contemplates that there will be fluctuations in requirements for this cost-reimbursement contract—indeed, offerors were required to explain

████████████████████████████████████████████████████████████

in their proposals how they would respond to such fluctuations.  It is well-established that agencies are afforded broad discretion when determining their own needs, and when choosing the appropriate contractual vehicle for those needs.

Further, DZSP's specific challenges to the Navy's evaluation each lack merit.  At its core, DZSP disagrees with the Navy's evaluation of both offerors' proposals as it relates to exempt labor rates.  DZSP attempts to disguise its mere disagreement by arguing that the Navy misunderstood Fluor's staffing proposal to retain the incumbent workforce, and further contending that DZSP's workforce replacement plan, which aimed to achieve ████████ cost growth for its exempt labor workforce over the life of the contract, was realistic.  However, the Navy evaluated Fluor's ████████████████████ and proposed goal to recruit 95 percent of DZSP's incumbent workforce before ultimately concluding that Fluor's proposal to ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ .

Likewise, because DZSP proposed ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████—without any supporting justification, the Navy was obligated to evaluate DZSP's probable cost of performance, and properly did so.  Moreover, because Fluor ████████████

████████████████████ DZSP's contention that the Navy evaluated the two offerors differently when it upwardly adjusted DZSP's cost but not Fluor's is misplaced.  As explained below, the record demonstrates that the Navy conducted a thorough and fair evaluation of both Fluor and DZSP's proposals.  The fact that DZSP would have reached a different conclusion falls woefully short of establishing that the Navy's evaluation was arbitrary, capricious, or in

violation of law.

In addition, DZSP's argument that the Navy should have normalized the offerors' application of the GRAP credit to the Guam GRT lacks merit because Government procurement officials, who are not local tax experts, are not required to engage in this level of detail when conducting a cost realism analysis.  Further, DZSP did not raise this argument in the first three GAO protests even though the Navy has never evaluated the GRAP credit as part of its cost realism analysis—thus barring it from doing so now.  For the reasons demonstrated below, the Court should deny DZSP's motion for judgment on the administrative record.

Finally, the Court should also deny DZSP's request that the Court supplement the administrative record with numerous contract administration documents related to its bridge contracts, and should similarly strike all references to these documents from DZSP's brief.  It is axiomatic that the administrative record focuses on the record before the agency in making its challenged decision.  However, because the Navy was not required to make a decision as to whether it should revise the solicitation and made no such decision, these voluminous documents are not properly included in the administrative record, but are instead a thinly-veiled attempt to invite the Court to engage in an extensive *de novo* review of DZSP's changed requirements argument.

## ARGUMENT

I.      **Standard Of Review**

      A.      **Standard Of Review For Procurement Challenges Generally**

Judicial review of the agency's actions in bid protest cases is not a *de novo* proceeding. Rather, the scope of the review is limited to the administrative record.  The proper standard of review is whether the agency action was arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law based solely upon the administrative record.  28 U.S.C.

§ 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v.*

*United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  The Court must consider whether the

decision was based upon consideration of the relevant factors and whether there has been a clear

error in judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971),

*overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

In reviewing the agency's procurement decisions, the Court should recognize that the

decision is entitled to a "presumption of regularity," *id.* (citations omitted), and it should not

substitute its judgment for that of the agency.  *Cincom Sys., Inc. v. United States*, 37 Fed. Cl.

663, 672 (1997); *see also M.W. Kellogg Co., v. United States*, 10 Cl. Ct. 17, 23 (1986)

("deference must be afforded to an agency's . . . procurement decisions if they have a rational

basis and do not violate applicable law or regulations").  Thus, the disappointed bidder "bears a

heavy burden," and the procurement officer is "entitled to exercise discretion upon a broad range

of issues confronting them." *Impresa*, 238 F.3d at 1332, 1333 (citations omitted).

When a protestor asserts a violation of regulation or procedure, "the disappointed bidder

must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa*, 238

F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Additionally, if the protestor can show any errors in the procurement process, the protestor must

then show that it was "significantly prejudiced" by those errors. *See Bannum, Inc. v. United*

*State*s, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citations omitted).  To establish significant

prejudice, the protestor must show that "there was a 'substantial chance' it would have received

the contract award but for the errors ...." *Id.* (citations omitted).

### B. Standard Of Review For Judgment Upon The Administrative Record

Pursuant to RCFC 52.1, this Court reviews the agency's procurement decisions to determine whether they are supported by the already-existing administrative record. The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. *Bannum*, 404 F.3d at 1355-56; *Lions Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 246-47 (2001); *Tech Systems, Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001) (explaining basis for summary judgment on the administrative record). Unlike a motion for summary judgment, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record[.]" *Bannum*, 404 F.3d at 1356. The inquiry, instead, is whether, given all of the disputed and undisputed facts, the plaintiff has met its burden of proof that the agency's decision was arbitrary, capricious or contrary to law. *Tech Systems*, 50 Fed. Cl. at 222. In reviewing the agency's actions under this narrow, deferential standard, "the focal point for judicial review should be the administrative record already in existence, not some record made initially by the reviewing court." *Florida Power & Light v. Lorion*, 470 U.S. 729, 734-44 (1985) (citation omitted).

## II. The Navy Is Not Required To Revise The Solicitation

DZSP raises a new argument that it never addressed in each of the four earlier GAO protests and also never raised to the Navy—*i.e.*, that because, in its view, the Navy's requirements have changed since the solicitation was issued in 2013, the Navy should be required to revise the solicitation. Pl. Mem. at 15-20. In particular, DZSP points to general military changes in the Asia-Pacific region, as well as purported increases in volume and scope of work that it has experienced as the incumbent while performing bridge contracts. *See generally* Pl. Mem. at 2, 15-20.

The Court should reject this argument for three separate and independent reasons. *First*, DZSP's speculation that the Navy will need to modify Fluor's contract in the future is not ripe for review. *Second*, DZSP never raised this argument during the evaluation process or multiple GAO protests, thus precluding its ability to do so now. *Third*, DZSP's argument is flawed on the merits because the solicitation for this cost-reimbursement contract expressly contemplated that there would be fluctuations in mission requirements—which is precisely why the Government chose this particular contract vehicle. *See* Tab 194, AR27111.

A.    **DZSP's Claim Is Not Ripe**

DZSP speculates that because its own workload has purportedly increased under its bridge contracts, Fluor's workload will also increase under the awarded contract. *See*, *e.g.*, Pl. Mem. at 22 ("Without an amendment to the Solicitation, Fluor will be negotiating for the additional services required by the Navy in a sole-source environment[.]"). However, the Navy has not issued any modifications increasing the requirements to Fluor's awarded contract. Thus, even if DZSP is correct in assuming that the Navy will need to issue modifications to Fluor's contract to account for the increases DZSP believes will occur, because the Navy has not yet done so, DZSP's claims are premature. *Bannum, Inc. v. United States,* 56 Fed. Cl. 453, 462 (2003) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe 'if it is premised upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"); *see also Texas Bio- & Agro-Defense Consortium v. United States*, 87 Fed. Cl. 798, 804 (2009) ("[W]hen resolution of an issue turns on whether 'there are nebulous future

events so contingent in nature that there is no certainty they will ever occur,' the case is not ripe

for adjudication.") (internal citations omitted).[6]

### B.     DZSP's Claim Is Also Waived

Further, in failing to raise this challenge earlier, DZSP has waived its "changed

requirements" argument as a matter of law.  Notably, and despite operating under multiple six-

month bridge contracts since July 2015, DZSP chose not to raise this claim during the evaluation

process or in any of Fluor's protests—when DZSP was the awardee.  *See*, *e.g*., Tab 3, AR206

(DZSP response to Fluor's first GAO protest); Tab 71, AR13321 (DZSP's comments on second

GAO protest); Tab 115, AR16640 (DZSP's comments on third GAO protest).  Nor did it raise

the issue after GAO, as part of Fluor's third protest, recommended in January 2017 that the

Navy reevaluate existing proposals and make a new source selection decision.  Tab 116,

AR16668.  Even after learning that the Navy had awarded the contract to Fluor, DZSP did not

include this argument in its own protest filed at GAO—***despite the fact that it was purportedly***

***experiencing an increase in requirements during that very timeframe***.  Tab 119, AR16854; *see*

*generally* Compl. at Ex. A (Wayne Cornell declaration) (contending that DZSP has experienced

"significant[]" changes in the Navy's requirements as part of its six-month extension from

December 2014, as well as under its bridge contracts stemming back to July 2015).  In sum,

there have been numerous opportunities for DZSP to raise this issue.  Instead, DZSP chose to

continue in the evaluation process, accepting the financial benefit of its bridge contracts in the

---

[6] In the event that the Navy issues any modifications to Fluor's contract to account for anticipated increases in workload, thus rendering DZSP's claim ripe for review, the Government will so inform the Court.

meantime, without at any time raising its instant claim that the Navy should issue a new solicitation.

Because DZSP made the tactical decision to participate in the evaluation process—as well as the various protests before GAO—without raising this "changed requirements" argument, it has waived any ability to do so now. *See, e.g.*, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007); *id*. at 1315-16 ("Moreover, Blue & Gold has not asserted good cause to excuse its delay in notifying the government of its objection"); *see also Comint Systems Corp. v United States*, 700 F.3d 1377, 1382-83 (Fed. Cir. 2012) (applying *Blue & Gold* where the agency issued Amendment 5, the protestor "signed and returned its copy of the amendment to the agency, signaling its agreement with its terms," but waited two and a half months after the issuance of Amendment 5 to raise its protest; protestor failed to preserve its claim because it "chose to wait and see whether it would receive an award of the contract."); *NVE, Inc. v. United States*, 121 Fed. Cl. 169, 179 (2015) ("A party who participates in a second round of proposal submissions rather than protesting cannot subsequently challenge an agency's decision to reopen discussions or reevaluate proposals.").

The purpose of the waiver rule is to prevent offerors from sitting on their rights and wasting the time and resources of Courts, other offerors, and the Government. *See Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016) ("The purpose of the waiver rule is to avoid just such after-the-fact litigation, where the issue could have been raised prior to the close of bidding."); *see also Blue & Gold*, 492 F.3d at 1314 ("In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal.  If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its

competitors.  A waiver rule thus prevents contractors from taking advantage of the government

and avoids costly after-the-fact litigation.").  DZSP should not be permitted to benefit now from

its tactical choice to sit on its rights.

> **C.      DZSP's Claim Also Fails On The Merits Because The Navy's Requirements Have Not Changed**

DZSP's claim also fails on the merits.  In essence, DZSP argues that because of

purported changes in military strategies in the Asia-Pacific region, as well as increases in its

volume of work under its bridge contracts, the Navy's requirements have changed, rendering the

solicitation out of date.  *See* Pl. Mem. at 2, 15-20.  DZSP similarly argues that the Navy has

included new work in its bridge contracts, such as supporting additional ships and patrol boats.

*Id*. at 19-20.  As an initial matter, DZSP seeks to supplement the administrative record with

numerous contract administration documents related to its bridge contracts that, in its view,

demonstrate this change in requirements.  Contrary to DZSP's assertion, *see* Pl. Mem. at 16, the

Government does have a basis for challenging DZSP's reliance on these extraneous

documents—notably, these documents, which were not considered or relied upon when the

Navy evaluated proposals for this procurement, are not properly included in the administrative

record.  As a result, we have included an opposition to DZSP's motion to supplement the

administrative record in our motion.  *See infra* at V.

Further, the Court should reject DZSP's "changed requirements" argument.  It is telling

that DZSP fails to cite a single analogous case for its novel proposition that this Court should

determine the Government's needs in light of the protestor's characterization of the Navy's

"military stances[]" in the Asia-Pacific region, as well as based on its own experience

performing bridge contracts.  This is not surprising given that it is the role of the Department of

Defense—not the courts—to determine its own mission requirements. *See, e.g., Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs 'is a matter within the broad discretion of agency officials ... and is not for [the] court to second guess.'") (citing *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004); *see also Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (underscoring the "great deference" that courts owe "to the professional judgment of military authorities concerning the relative importance of a particular military interest"). DZSP's request that this Court order the Navy to conduct a new solicitation is a transparent effort to lock in for itself the opportunity to negotiate yet another bridge contract on a sole-source basis during the pendency of such procurement and whatever protests follow. Such gamesmanship should be rejected.

In any event, the Navy's requirements have not changed—the solicitation required offerors to provide ***all facets*** of base operations services to CJRM. *See* Tab 8a, AR384. Indeed, the PWS explained that "[t]he purpose of this [BOS] contract is to provide integrated base operations services to the [CJRM], Supported Components & Tenant Commands in carrying out their missions." *Id.* The PWS also indicated that "[t]he Contractor shall furnish **all** necessary qualified personnel, supervision, management, tools, materials, equipment, facilities, transportation, incidental engineering, and other items necessary to provide" a variety of services, including management and administration, port operations, ordnance, material management, facilities support, utilities, base support vehicles and equipment, and environment services. *Id.* (emphasis added).

Because the contract would involve such a wide array of support services, it necessarily follows that ***mission requirements*** would fluctuate. Indeed, the solicitation is for a cost-reimbursement contract. Tab 194, AR27010; *see also* AR27047 (incorporating by reference

FAR 52.249-6 "Termination (Cost-Reimbursement)[]").  The Government uses cost-reimbursement contracts when either (1) "[c]ircumstances do not allow the agency to define its requirements sufficiently to allow for a fixed-price type contract[;] or (2) "[u]ncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract."  48 C.F.R. § 16.301-2.[7]  The Navy chose this structural vehicle for the BOS contract because requirements would fluctuate—indeed, the solicitation itself *anticipated* that the actual requirements needed to provide base operations services would change; as a result, it required offerors to address in their proposals how they would respond to workload fluctuations.  *See* Tab 194, AR27111 ("[t]he evaluation will also include the Offerors approach to handling surge/contingency operations and *fluctuations in mission requirements*.") (emphasis added).  DZSP offers no legal support for the proposition that anticipated fluctuations in requirements for a cost-reimbursement contract constitute a material change that requires the Government to revise its solicitation.  *See*, *e.g*., *CWT/Alexander Travel, Ltd. v. United States*, 78 Fed. Cl. 486, 493-96 (2007) (holding that there was no cardinal change in the Government's requirements due to a delayed start date and alleged price modifications, noting that "[t]he solicitation contemplated price changes and authorized price negotiations to deal with changes in ticket volume requirements and technology.  Indeed, given the nature of the travel services required under the contract, price changes were viewed as inevitable.").

Further, because the solicitation expressly directed offerors to explain how they would respond to fluctuations in mission requirements, DZSP's argument that it could have submitted a

---

[7] To that end, DZSP's reliance on *Consolidated Engineering Services, Inc. v. United States*, 64. Fed. Cl. 617, 639-40 (2005), *see* Pl. Mem. at 15-16, is misplaced, as that case involved a fixed-price contract.

more efficient and cost-effective proposal is misplaced. *See* Pl. Mem. at 20-22; *see also* Tab

194, AR27111. Put another way, the solicitation itself made clear that there would be inherent

uncertainty in the Government's requirements (hence, the use of a cost-reimbursement contract).

Thus, that DZSP could have submitted a different proposal with the benefit of hindsight is

irrelevant. Moreover, although DZSP contends that it would have submitted a more efficient,

cost-effective proposal in response to changed requirements, it has not actually demonstrated

how such a different proposal would have improved its competitive position. Rather, DZSP's

argument amounts to mere conjecture and speculation. *See Allied Materials & Equip. Co. v.*

*United States,* 81 Fed. Cl. 448, 462 (2008) (protester failed to demonstrate that reduced price

would result in sufficiently lower price to overcome awardee's superior rating). In any event, as

this is a negotiated procurement under FAR Part 15, DZSP had ample opportunity to raise

questions regarding how mission fluctuations could impact its proposal. If DZSP believed that

the solicitation should have provided more certainty as to projected requirements, it should have

raised that argument in a pre-award bid protest. *See Blue & Gold*, 492 F.3d at 1313.

In addition, DZSP takes issue with the fact that the Navy did not contemplate revising

the solicitation given the length of time since the solicitation was first issued. Pl. Mem. at 22-

23. In its view, the Navy "fail[ed] even to consider this plain problem" regarding the passage of

time and purported changes in work under DZSP's bridge contract. *Id*. at 22. However, it is

telling that DZSP cites no analogous case law for the proposition that the Government is

required to make this assessment. Indeed, the cases that DZSP relies upon for this argument are

readily distinguishable. *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir.

2011) ("Commerce did not sufficiently explain why two of [the protestor's] concerns about the

use of unaffiliated suppliers' actual cost data were not implicated or why they were outweighed

by competing considerations."); *FCN, Inc. v. United States*, 115 Fed. Cl. 335, 371-73 (2014)

(the agency failed to explain whether government-furnished property was offered and available

for proposals and, thus, subject to FAR Part 45); *see also* Pl. Mem. at 22-23.

Ultimately, the Department of Defense has broad discretion to determine its own needs,

and it is not the place of offerors to dictate how the Government makes those determinations.

*See Savantage Fin. Servs.*, 595 F.3d at 1286-87.  As demonstrated above, there are numerous

flaws with DZSP's "changed requirements" argument.  The Court should reject DZSP's attempt

to substitute its own judgment for that of the Navy.

## III.     The Navy's Decision To Award The Contract To Fluor Was Rational

The record demonstrates that after GAO expressed concerns with the Navy's evaluation,

the Navy took affirmative steps to buttress its evaluation process by assigning a new SSA,

reconvening the CET team, and conducting a detailed review of proposals.  As explained below,

the Navy conducted a rigorous evaluation into Fluor and DZSP's proposals before ultimately

determining that it was in the best interest of the Government to award the contract to Fluor.

DZSP masks its mere disagreement with the conclusions of the Navy with unsupported

claims that the Navy misunderstood Fluor's staffing proposal, should have determined DZSP's

replacement plan was realistic, and should have normalized each offeror's application of the

GRAP credit to the Guam GRT tax when evaluating proposals.  However, "the minutiae of the

procurement process in such matters as technical ratings . . . involve discretionary determinations

of procurement officials that a court will not second guess."  *E.W. Bliss Co. v. United States,* 77

F.3d 445, 449 (Fed. Cir.  1996).  The record demonstrates that the Navy's evaluation of DZSP

and Fluor's proposals was rational and violates no law or regulation.

30

███████████████████████████████████████████████████████

**A.    The Navy Properly Evaluated Fluor's Proposal And Awarded It A Strength For Its Plan To Retain The Incumbent Workforce**

DZSP argues that the Navy misunderstood Fluor's plan to retain incumbent personnel. *See* Pl. Mem. at 23.  According to DZSP, the Navy misinterpreted Fluor's promise that ████

██████████████████████████████████████████████████████

██████████████████████████.  *Id.*  In particular, DZSP contends that the SSA's interpretation of this promise ███████████████████████████████

█████████████████████████ represents a wholesale misunderstanding of Fluor's proposed staffing approach.  *Id.*  However, the record demonstrates that the Navy properly considered the risk that ██████████████████████████████████

████████, and Fluor ██████████████████████████████████.  Moreover, Fluor's proposal ████████████ was ancillary to the strength that the Navy attributed to its proposal to recruit the incumbent workforce.  Furthermore, even if this strength were disregarded altogether, DZSP cannot demonstrate prejudice because Fluor's proposal would remain the higher-rated, lower-cost proposal.

**1.    The Navy Understood Fluor's Proposal**

DZSP's argument fails because the Navy understood and properly evaluated Fluor's proposal to retain incumbent personnel.  In its technical proposal, and in response to Factor C, Staffing and Resources, Fluor indicated that "[i]t is our intention that of the employees we hire, 95 percent are from the incumbent workforce to retain institutional knowledge and promote continuity of services[.]"  Tab 147, AR20228 (June 27, 2014 Fluor technical proposal); Tab 149, AR22285 (same language included in Fluor's October 27, 2015 technical proposal); Tab 237, AR28661 (same as to Fluor's July 29, 2016 technical proposal).

████████████████████████████████████████████████████████

Notably, the Navy evaluated this intent as a strength in every technical evaluation of Fluor's proposal during the course of this procurement, with the exception of the TET's initial February 2014 report. *See* Tab 157, AR25402 (April 2014 TET report identifying Fluor's intent to retain 95 percent of the incumbent workforce as a strength); Tab 162, AR25665 (same as to July 2014 TET report); Tab 168, AR26061 (same as to August 2015 TET report); Tab 172, AR26209 (same as to October 2015 TET report); Tab 177, AR26549 (same as to April 2016 TET report); Tab 188, AR26927 (same as to July 2016 TET report); *but see* Tab 152, AR25001 (February 2014 TET report). As such, the Navy identified this intention as a strength long *before* Fluor modified its proposal in 2016 to ███████████████████████████ ███████████████████████████████. *See*, *e.g.*, Tab 92, AR13750-13753 (in response to questions from the Navy, Fluor provided its June 27, 2016 narrative response regarding ████████); *see also* Tab 237, AR28661 (incorporating narrative response into its technical proposal). Indeed, even the July 2016 TET—which indicated that Fluor's intent to recruit 95 percent of the incumbent personnel would be "challenging to implement with the salaries proposed[]"—nonetheless found this aspect of Fluor's proposal to be a strength and, therefore, rated Fluor's proposal as "Outstanding" under Factor C, Staffing and Resources. Tab 188, AR26927, AR26929.

This assessment was entirely reasonable because Fluor's intent to recruit a higher percentage of its personnel from the incumbent workforce was understood to facilitate the retention of "institutional knowledge" and "continuity of services[]" as stated in Fluor's proposal. *See* Tab 188, AR26929 (July 2016 TET report); *see also* Tab 193, AR27003 (2017 SSA decision); Tab 92, AR13750; Tab 237, AR28661. Nonetheless, Fluor's 95 percent recruitment objective is one that could be subject to various contingencies, including the salaries

██████████████████████████████████████████████████████

offered by Fluor.  The acknowledgement of such contingencies does not invalidate the value attributed to Fluor's proposal, but simply requires the Government to assess the value of the proposal in the context of practical realities.  This is exactly what the Navy did.

Indeed, Fluor proposed ████████████████████████████████████████ in response to the Navy's question regarding Fluor's plans to recruit exempt personnel should the incumbent workforce not agree to work for Fluor at reduced rates.  Tab 92, AR13750.  In response to this question, Fluor stated:



Tab 92, AR13753; *see also* Tab 237, AR28661 (incorporating response into its technical proposal).

In evaluating this promise against the risks that the Navy had identified with respect to Fluor's 95 percent recruitment objective, the SSA stated:



Tab 193, AR27003.

Thus, the SSA's interpretation of Fluor's proposal properly recognized that Fluor would in fact ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████[8]███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ Indeed, GAO reached a similar conclusion following Fluor's third protest, noting

that ████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Tab 116,

AR16666.

For DZSP's complaint to make sense, it must posit a world where █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████. It may be true that Fluor did

---

[8] While the CET framed the issue as a proposal █████████████████████████████ *see* Tab 192,
AR26978, we note that the CET was not charged with a technical evaluation of Fluor's proposal
and did not assign technical strengths or ratings.  In any event, and as explained further below,
the CET was correct in its conclusion that ██████████████████████████████████
███████████ associated with this aspect of the proposal.  *Id.*

████████████████████████████████████████████████████████████

not ███████████████████████████████████████████████, *see* Pl. Mem. at

23, 25, but the significance of such point is trivial.  Such a proposal would not be reasonable, and

there is no indication that the Navy had such expectation of Fluor—much less that the selection

of Fluor hinged in any way on such an expectation.  Ultimately, after the Navy identified a risk

associated with Fluor's proposed salaries for exempt personnel, Fluor ██████████████

██████████████████████████████████████████████████  *See*

*generally* Tab 92, AR13753; *see also* Tab 237, AR28661.  The SSA recognized as much and

properly attributed a strength to Fluor's 95 percent recruitment objective.  Tab 193, AR27003.

This was reasonable.

## 2.   Even If The Navy Erred, DZSP Cannot Demonstrate Prejudice

Furthermore, even if the Court were to conclude that the SSA (and GAO) misunderstood

the import of ██████████████████████████, DZSP cannot demonstrate

prejudice.  *See Bannum*, 404 F.3d at 1353; *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562

(Fed. Cir. 1996) (in addition to showing a significant error in the procurement process, a

protester must show that it was prejudiced by the error).  DZSP contends that it has demonstrated

prejudice because, in its view, had the Navy understood Fluor's proposal, it would have either

downgraded its technical rating or adjusted its cost upwards.  Pl. Mem. at 28-29.  However, this

argument is inconsistent with both the record and prevailing law.

Notably, the TET, which assigned technical ratings for this procurement, rated Fluor's

proposal as "Outstanding" in Factor C, Staffing and Resources, ***despite*** having indicated that

Fluor would face challenges meeting its recruitment objective at the salaries proposed.  Tab 188,

AR26927 (July 2016 TET report).  This "Outstanding" rating was assigned even though the TET

failed to give any weight whatsoever to Fluor's ████████████████████████

███████████████████████████

████████████████████ by the subsequent CET and SSA.  AR26927-26929; *see also* Pl. Mem.

at 24-25 (discussing purported errors).  DZSP has provided no basis to question such assessment.

Additionally, even if the strength attributed to the 95 percent recruitment objective was

disregarded altogether, Fluor would have an equivalent number of strengths as DZSP's proposal

for Factor C because the SSA attributed six strengths to DZSP's proposal and seven strengths to

Fluor's.  Tab 193, AR26995 and AR27002.  Moreover, Fluor's proposal under Factor D,

Technical Approach, which is equally rated to Factor C, was rated "Outstanding" whereas DZSP

only received a "Good."  AR26985-26986; AR26995; AR27003.  Further, while DZSP and Fluor

received the same rating level under all of the other non-cost factors (*see* Tab 193, AR26986),

the SSA specifically noted that Fluor also had the "slightly stronger" proposal under Factor B.

Tab 193, AR27006.  Thus, even accepting DZSP's argument that the Navy erred in awarding

Fluor an additional strength, at best, DZSP is only able to level the playing field on Factor C, but

still ranks behind Fluor under both Factors B and D.  DZSP has never challenged this

assessment, notwithstanding its general conclusory assertions that DZSP and Fluor's proposals

were equal overall in the non-cost factors.  *See, e.g.*, Pl. Mem. at 29 (noting the "overall

proximity of the proposals[]").

        Under these circumstances, DZSP cannot show, as it must, that its proposal would have a

substantial chance of displacing Fluor as the highest-ranked technical proposal.  Where Fluor

remains the highest-ranked offeror in the non-cost factors and the lowest-cost offeror, award

must go to Fluor and there is no basis to question what the SSA might have done with regard to a

best value tradeoff.  *See* FAR 15.101-1(c) (tradeoff-process permits tradeoffs between cost or

price and non-cost factors).  Thus, the posture of DZSP's complaint is quite different from what

DZSP considers to be a similar error associated with the Navy's failure to consider the risk

inherent in DZSP's employee turnover plan that provided the basis for GAO to grant relief in Fluor's third protest.  Tab 116, AR16668 (GAO decision sustaining Fluor's protest); *see also* Pl. Mem. at 35-36 (arguing that the Navy evaluated DZSP and Fluor's proposals disparately).  In the prior protest, DZSP was considered to be the lower-cost offeror while Fluor had the technically-superior proposal.  AR16662-63.  Thus, the potential impact of the Navy's error was uncertain.

For this same reason, DZSP's reliance on *BayFirst Solutions LLC v. United States*, 102 Fed. Cl. 677, 686 (2012), is misplaced.  *See* Pl. Mem. at 26-27.  In *BayFirst*, the agency had selected the higher-cost higher-rated offeror; as a result, there was a substantial chance that the SSA's tradeoff analysis would have been different but-for the errors in the evaluation.  102 Fed. Cl. at 695 (noting that where "BayFirst was the lowest-priced offeror[]" and the agency conducted a flawed evaluation, "[t]here is a substantial chance that the SSA's tradeoff analysis would [] have indicated that BayFirst's proposal, not VSI's higher-priced proposal, provided the best value to the government."); *see also Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 767 (2008) ("Because a reevaluation of these factors would, at a minimum, lower the ***ratings*** of two contract awardees, the possibility exists that the Source Selection Authority's tradeoffs would change") (emphasis added).  In contrast here, because Fluor remained the higher-rated, lower-cost offeror, DZSP cannot demonstrate a substantial chance of award.

Nor can DZSP establish prejudice by arguing that the Navy should have, in the alternative, rejected Fluor's ▓▓▓▓▓▓▓ and adjusted its overall costs upwards—thus presumably rendering DZSP the lower-cost offeror.  *See* Pl. Mem. at 29.  As an initial matter, we note that DZSP does not identify any purported cost adjustment that it contends is required.  Instead DZSP merely invites the Court to speculate as to what such an adjustment might be.  Such omissions do not meet the plaintiff's affirmative burden of establishing prejudice.  *See*

███████████████████████████████████████████████████

*Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 314 (2010) (citing *Bannum*, 404 F.3d at 1353).

In any event, a cost adjustment would not be appropriate for the error that DZSP alleges.  ████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

        Thus, where, as here, ██████████████████████████, there would be no basis to

conduct a cost realism analysis otherwise prescribed at FAR 15.404-1(d)(2) because ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████.   As a result, the Navy's decision not to adjust Fluor's cost upward due to the possibility

that ███████████████████████████████████ was in full accord

with applicable regulations and law.  Indeed, it is telling that DZSP cites no analogous case law

for its view that the Navy committed legal error by failing to adjust Fluor's cost.

███████████████████████████████████████████████████████████

Ultimately, the record demonstrates that the Navy properly evaluated Fluor's proposal, and DZSP has not identified any significant errors in this evaluation that would cast the selection of Fluor in doubt.  Thus, this protest ground should be denied.

**B.      The Navy Properly Determined That DZSP's Proposed Costs Related To Its Replacement Plan Were Unrealistic**

DZSP also argues that the Navy improperly determined that its replacement plan was unrealistic. Pl. Mem. at 30-34.  The record, however, demonstrates that the Navy carefully reviewed DZSP's proposal before determining that (1) DZSP's plan and proposed cost savings were inconsistent with its technical proposal and historical data; and (2) DZSP failed to provide support for its plan.  That DZSP would have reached a different conclusion is not a basis for overturning the well-reasoned decision of the Navy.  Furthermore, and contrary to DZSP's suggestion otherwise, the SSA was not required to adopt the findings of the TET when evaluating DZSP's proposal.

**1.      The SSA Conducted A Thorough Evaluation Of DZSP's Plan**

The administrative record makes clear that the Navy performed a thorough evaluation of DZSP's plan to replace ███ percent of its incumbent workforce on an annual basis before determining that this plan was inconsistent with DZSP's technical proposal, unsupported and, as a result, unrealistic. *See* Tab 193, AR26995; *see also* Tab 192, AR26971-26974.

DZSP submitted conflicting information in its cost and technical proposals that the Navy was forced to reconcile when reevaluating proposals.  In particular, on June 24, 2016, DZSP included a "revised workforce replenishment plan[]" in its cost proposal indicating that it planned to ████████████████████████████████████████████████████████
███████████████████████████████████████ Tab 91, AR13747.  DZSP explained that its replacement plan would include a ███ percent salary "decrement" for new employees

39

██████████████████████████████████████████████████████████████

that would ████████████████████████████████████████████████████████

████████████ and would, in turn, result in a ████████████████████████ over the life of

the contract.  AR13748.  Notably, however, DZSP's replacement plan as stated in its cost

proposal—*i.e*, promising ███████████████████[9] with ███████████ in exempt labor rates—

differed from its technical proposal.  Indeed, DZSP's final technical proposal indicated that the

company would continue to use the █████████████████████████████████████████████

████████████████████████████████.  *See* Tab 150b, AR23536 (DZSP July 29,

2016 final proposal revisions) (highlighting DZSP's █████████████████████████

██████████████████████████████████████████████

(emphasis removed)); AR23537 (DZSP intended to use ██████████████████████████

███████████████████████████████████████████████████████████);

AR23492 (identifying ████████████████████████████████████████████████

████████████████████).  ████████████████████████████████████

████████████████████████.  AR23492; AR23536; *see also* Tab 192, AR26973.

Due to these inconsistencies, the 2017 CET—which the Navy reconvened in order to

evaluate the parties' proposals in light of GAO's concerns regarding the adequacy of the Navy's

earlier evaluation of the offerors' exempt labor rates—determined that DZSP's replacement plan

was unrealistic.  Tab 192, AR26972-26973.  The CET further noted that DZSP failed to offer

data to support either its proposed ██████ in exempt labor workforce turnover or the proposed

██ percent decrement factor, which ultimately led the CET to conclude that there was a

"substantial risk" DZSP would not be able to achieve its proposed ████ change in exempt labor

---

[9] GAO noted that "[g]iven this rate of replacement, DZSP essentially will replace ██
percent of its incumbent exempt staff during approximately the first ████████ years of
contract performance[.]"  Tab 116, AR16666.

rates.  AR26973-26974.  Thus, the CET applied an upward adjustment to DZSP's total contract price to account for an increase in exempt labor costs.  AR26975-26977.  The SSA agreed with the CET's assessment regarding the inconsistency in the two proposals, and further agreed with the CET's adjustment rate of 1.29 percent.  Tab 193, AR26988-26989.  The record demonstrates that the SSA provided a detailed and thorough explanation as to why she concurred with the CET's conclusions.  *See generally id.*

## 2.   The SSA Was Not Bound By The Findings Of The TET

DZSP's challenge to the Navy's evaluation of its replacement plan largely stems from its belief that the SSA should have either adopted the earlier findings of the TET (which favored DZSP), or reconvened the TET, rather than conducting her own independent evaluation of DZSP's proposal.  *See* Pl. Mem. at 31 (arguing that the Navy "entirely shut the TET out of the re-evaluation process[]"); *id.* at 30-32 (contending that the TET determined that DZSP's replacement plan was "very realistic"); *see generally id.* at 30-35 (generally challenging the SSA's rejection of the 2016 TET findings).  However, the fact that DZSP would have conducted the evaluation differently is irrelevant.

Instead, it is well settled that a source selection authority is afforded deferential discretion in determining what information he or she needs to evaluate proposals and select an awardee— *particularly* when it involves a technical evaluation.  *See*, *e.g.*, *Gulf Group, Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004) (quoting *Overstreet Electric Co., Inc. v. United States*, 59 Fed. Cl. 99, 117 (2003)) (noting that when a negotiated procurement is involved, and the protest concerns the agency's technical or past performance evaluation, "the greatest deference possible is given to the agency—what [the] Court has called a 'triple whammy of deference.'"); *Transatlantic Lines, LLC v. United States*, 122 Fed. Cl. 624, 631 (2015), *aff'd*, 644 F. App'x. 1024 (Fed. Cir.

2016) ("'It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals.'") (quoting *Omega World Travel, Inc. v. United States,* 54 Fed. Cl. 570, 578 (2002)).  DZSP cites no case law for the proposition that an agency is required to reconvene a technical panel simply because the protestor would have chosen to do so.

The Court should further reject DZSP's similar complaint that the findings of the TET and CET are inconsistent.  Pl. Mem. at 30-32.  Although the 2016 TET determined, as part of the Navy's third evaluation, that DZSP's replacement plan was "very realistic[,]" *see* Tab 106, AR13986, the SSA exercised her independent judgment before reaching a different conclusion during the agency's final evaluation of proposals.  Tab 193, AR26988.  Notably, she explained that "[w]hile the SSEB had found [DZSP's replacement plan] to be realistic and reasonable, the June 2017 CET's evaluation of this workforce replenishment plan determined that it was not realistic and required a probable cost adjustment increase.  I also conclude that DZSP's FPR cost proposal was unrealistic."  AR26995.  DZSP cites no relevant case law for the proposition that the SSA is bound by the determinations of lower-level evaluation officials—to the contrary, the SSA should exercise her own independent judgment—which is precisely what the SSA did in this case.  *See Coastal Int'l Sec. v. United States*, 93 Fed. Cl. 502, 536 (2010) ("As a matter of law, the 2009 SSA is not bound by the findings of the 2009 SEB, since a SSA is required to exercise 'independent judgment' in making a source selection decision"); *see also* FAR 15.308 ("While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment.").  For these reasons, DZSP's related assertion that the earlier TET findings are "entitled to deference[]" is incorrect.  Pl. Mem. at 31.  It is the *agency's* decision that is entitled to deference.  *See*, *e.g*., *Gulf Group*, 61 Fed. Cl. at 351.

Similarly, DZSP's contention that the Navy failed to reconcile the different conclusions of the CET and TET, *see* Pl. Mem. at 33-34, is inaccurate and refuted by the record.  The SSA clearly explained that she reviewed the 2017 CET report, the 2016 TET report, the 2016 SSEB report, the 2016 SSAC report, and the final proposal revisions, and further explained that despite the TET's findings, she agreed with the CET's conclusions that DZSP's replacement plan was not realistic.  Tab 193, AR26984, AR26988-26989, AR26995.  While she acknowledged that the SSEB previously determined[10] that DZSP's plan was realistic, she nonetheless reached a different conclusion following her independent review of proposals and the various lower-level evaluation reports.  *See, e.g.*, AR26995 (acknowledging the SSEB's earlier determination); *see also* Tab 106, AR13973 (2016 TET report); Tab 107, AR14024 (2016 SSEB report).  The record clearly demonstrates that the SSA agreed with the findings of the 2017 CET and disagreed with earlier source selection reports regarding DZSP's replacement plan.  Tab 193, AR26995 ("While the SSEB had found this plan to be realistic and reasonable, the June 2017 CET's evaluation of this workforce replenishment plan determined that it was not realistic[.]").  Thus, DZSP's

---

[10] DZSP also takes issue with the fact that the SSEB's July 25, 2016 report did not specifically address the TET's findings regarding its replacement plan. Pl. Mem. at 34; *see also* Tab 107, AR14024.  However, the July 25, 2016 SSEB report enclosed a copy of the 2016 TET report, and ultimately concluded that it "agree[d] with the ratings assigned by the TET."  Tab 107, AR14025; Tab 106, AR13973 (TET report); *see also* Tab 96, AR13870 (July 9, 2016 SSEB report).  DZSP cites no legal authority for the proposition that the SSEB was required to separately document why it agreed with the TET's findings.  Indeed, evaluations often "flow-up,"—*i.e.*, the final integrated assessment may contain less detail than earlier documents that the deciding official considered.  *See, e.g.*, *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 119 (2006) (noting that "the technical reports provided to the SSA contain a detailed assessment of every Factor and Subfactor mentioned in the Solicitation" and further noting that "as long as the agency evaluators conducted a contract-by-contract assessment, the SSA may rely on this evaluation *without performing* the same detailed analysis.") (citing *Computer Scis. Corp. v. United States*, 51 Fed. Cl. 297, 320 (2002)) (emphasis in original).

███████████████████████████████████████████████████████████████

reliance on *Honeywell Tech. Solutions, Inc., Wyle Labs, Inc.*, B-292354, Sept. 2, 2003, 2005

CPD ¶ 107, is misplaced.   *See* Pl. Mem. at 34.

DZSP's true complaint is that the Navy should not have reviewed its replacement plan so

carefully when reevaluating proposals but instead should have adopted the TET's earlier

determination that DZSP's plan was realistic.  The fact that DZSP would have evaluated its

proposal differently is irrelevant given the broad discretion afforded deciding officials.  *See, e.g.*,

*Cincom Sys., Inc.*, 37 Fed. Cl. at 672; *see also M.W. Kellogg Co.*, 10 Cl. Ct. at 23.

**C.**   **The Navy Did Not Evaluate DZSP and Fluor's Staffing Proposals Unequally**

In a related argument, DZSP contends that the Navy conducted a disparate evaluation of

it and Fluor's proposals when it upwardly adjusted DZSP's costs (due to the inconsistencies in

its technical and cost proposals regarding DZSP's replacement plan) but did not upwardly adjust

Fluor's costs due to the Navy's purported misunderstanding of Fluor's ████████████████

█████████████ .  *See generally* Pl. Mem. at 35-36 (providing three examples of the Navy's

allegedly unequal treatment of DZSP and Fluor's proposals as it relates to DZSP's replacement

plan and Fluor's ██████████████ ).  The Navy did not evaluate DZSP and Fluor's proposals

unequally.  Notably, DZSP's replacement plan indicated that it expected to achieve a ██████

█████████████████████████ over the life of the contract. Tab 91, AR13748.  As part of its

cost realism analysis, the Navy determined that this cost was unrealistic because it was

inconsistent with DZSP's technical proposal and historical data. Tab 193, AR26995.  In other

words, because there was a risk that DZSP would not be able to achieve a █████████ increase

in exempt labor costs over the life of the contract, the Navy could end up paying more for

DZSP's proposal in this cost-reimbursement contract.  The Navy, therefore, properly determined

DZSP's probable cost of performance.  *See* FAR 15.404-1(d).

███████████████████████████████████████████████████████████████

In contrast, Fluor offered ██████████████████████████████████████

███████████████████ stating that it ██████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████ Tab 92, AR13753.  In light of Fluor's █████████████████████,

the Navy was not required to make an upward cost adjustment to its proposal, and DZSP cites no

case law requiring such a result.  ████████████████████████████████████

██████████.  Thus, DZSP's disparate treatment argument is belied by the record.

**D.    The Navy Was Not Required To Normalize The Offerors' Application Of The GRAP Credit To The Guam GRT**

DZSP further contends that the Navy failed to normalize DZSP and Fluor's application of

the Guam Registered Apprenticeship Program (GRAP) credit to the Guam Gross Receipts Tax

(GRT) when evaluating proposals.  Pl. Mem. at 36-38.  DZSP's claim is unfounded because

Navy evaluators, who are not tax experts, are not required to engage in this level of detail when

conducting a cost realism analysis—a sentiment that DZSP itself argued during Fluor's second

GAO protest.  Further, DZSP has known since as early as 2014 that the Navy was not normalizing

the offerors' individual application of the GRAP credit when conducting its cost realism analysis.

Therefore, DZSP's failure to raise this argument sooner precludes its ability to do so now.

**1.    DZSP's Claim Fails On The Merits**

DZSP's argument fails as a matter of law.  The calculation of the GRAP credit to the

Guam GRT is a complicated tax question that the Navy was not required to resolve when

conducting its cost realism analysis.  Indeed, although the solicitation provided offerors with

guidance as to how they should apply the Guam GRT when determining their costs, the

solicitation was silent regarding the impact of any potential GRAP credit that DZSP and Fluor

might receive against the Guam GRT.  *See* Tab 8a, AR4252 (#90 discussing the GRT); *id.* at

███████████████████████████████████████████████████

AR4269 (#140 discussing the GRT); *see also* Tab 194, AR27008 (the solicitation does not

mention the GRAP); Tab 8a, AR247 (same for the conformed solicitation).  Instead, the

solicitation directed offerors to direct any questions regarding "Guam Territorial Law" to the

"Government of Guam, Department of Revenue and Taxation[.]"  Tab 194, AR27040.

DZSP cites no legal authority for its proposition that the Navy was required to evaluate

each offerors' proposed GRAP credit.  Indeed, DZSP conceded as much in Fluor's second protest.

*See* Tab 74, AR13420 ("[o]nly through an exhaustive analysis of Fluor's application of the

Guam apprenticeship program could the Navy have reverse-engineered the ████████ % rate.

***That level of analysis is far beyond any reasonable requirement for an agency's cost realism***

***evaluation***.") (emphasis added).  Instead, case law makes clear that "the nature and extent of an

agency's price realism analysis are matters within the agency's discretion."  *Labat-Anderson,*

*Inc. v. United States*, 50 Fed. Cl. 99, 106 (2001).  "In order to overturn the agency's cost realism

determination, plaintiff must establish that the [agency's] decision lacked a rational basis."

*Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (citing *JWK Int'l Corp v. United*

*States*, 49 Fed. Cl. 371, 393 (2001)).  The touchstone for review is reasonableness, *Ceres Envtl.*

*Servs. v. United States*, 97 Fed. Cl. 277, 303 (2011), and the Court should only interfere with the

procuring agency's function in this area if the protestor can demonstrate that the agency made

"'irrational assumptions or crucial miscalculations.'"  *Mil-Mar Century Corp. v. United States*,

111 Fed. Cl. 508, 541 (2013).  To this end, the Federal Circuit has specifically stated that the

Court is "not to introduce new requirements outside the scope of the RFP" through judicial

review.  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir.

2009).  Notably here, the solicitation did not reference the GRAP—much less indicate how, if at

████████████████████████████████████████████████████████████████████

all, the Navy would consider the offerors' application of the GRAP credit.  Tab 194, AR27008;

Tab 8a, AR247.

On a final note, DZSP's assumption that it and Fluor applied the GRAP credit differently

is speculative.  *See* Pl. Mem. at 37.  Not only would each offeror's different application of the

credit have required a detailed understanding of Guam tax law, but it is unclear that the offerors'

different technical approach to implementing their apprenticeship programs would not have

merited different tax treatment consistent with each offeror's cost proposal.  For example, DZSP

indicated in its proposal that it ████████████████████████████████████████████

██████████████████████████████████.  *See* Tab 150a, AR22516 (portion of DZSP

final cost proposal discussing its utilization of the GRAP).  In contrast, Fluor provided ███████

████████████████████████████████████████████████████.  Tab 151a, AR24240

(portion of Fluor final cost proposal discussing same).  In any event, because the Navy was not

required to engage in this level of analysis, the Court should reject DZSP's attempt to impose a

higher standard on the Government as it relates to the Navy's cost realism analysis than what is

required by law.  *See Labat-Anderson*, 50 Fed. Cl. at 106.

## 2.    DZSP Has Waived This Argument As A Matter Of Law

Further, DZSP has waived this challenge as a matter of law.  Indeed, at no point during

this procurement has the Navy evaluated the offerors' application of the GRAP credit when

conducting its cost realism analysis.  *See, e.g.*, Tab 8a, AR4555, AR4571 (February 14, 2014

initial CET report notes DZSP and Fluor's application of a credit for the GRAP to the Guam

GRT, but does not evaluate the proposed GRAP credits further); *see also* Tab 38, AR10474,

AR10478 (same for August 31, 2015 CET report); Tab 94, AR13766-13767, AR13771-13772

(same for July 8, 2016 CET report); Tab 105, AR13916-13917, AR13921-13922 (same for July

22, 2016 CET report). Thus, if DZSP believed that the Navy was required to engage in this level

of detail in its cost realism analysis, it should have raised this argument earlier. *See Blue & Gold*,

492 F.3d at 1313. Indeed, DZSP took the ***opposite*** position in Fluor's second GAO protest. *See*

Tab 74, AR13420.

## IV.    DZSP Has Not Demonstrated That It Is Entitled To Permanent Injunctive Relief

DZSP's request for permanent injunctive relief should also be denied. Pl. Mem. at 38-40.

To obtain permanent injunctive relief, DZSP must demonstrate that (1) it is entitled to relief on

the merits, (2) irreparable harm would result if an injunction does not issue, (3) the harm suffered

if injunctive relief is not granted will outweigh the harm to the Government and third parties if

the temporary relief is granted, and (4) granting the injunction serves the public interest. *See*

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). The grant of an

injunction is "extraordinary relief[;]" therefore, the Court applies "exacting standards." *Lermer*

*Germany GmbH v. Lermer Corp*., 94 F.3d 1575, 1577 (Fed. Cir. 1996). The Supreme Court has

held that an "injunction is a drastic and extraordinary remedy, which should not be granted as a

matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation

omitted). The party seeking injunctive relief bears the extremely heavy burden of demonstrating

its entitlement to this extraordinary relief by clear and convincing evidence. *E.g., Cincom  Sys.,*

*Inc. v. United States,* 37 Fed. Cl. 266, 268 (1997). DZSP cannot meet this burden.

*First*, as demonstrated above, DZSP cannot succeed on the merits.

*Second*, DZSP cannot demonstrate irreparable harm. DZSP argues that it will suffer

irreparable harm due to the lost opportunity to compete. Pl. Mem. at 38. However, "economic

loss without more does not rise to the level of irreparable injury." *Spherix, Inc. v. United States*,

62 Fed. Cl. 497, 506 (2004) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed.

████████████████████████████████████████

Cir. 1983)).  Further, an unsupported allegation that a party will be deprived of a chance to

compete fairly cannot meet the standard for irreparable harm simply because, if it did, "any bid

protest would involve an irreparable injury."  *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480

(2001).[11]

*Third*, the harm to the Government outweighs the harm to DZSP.  The purpose of this

contract is to provide integrated base operations services at various military installations for the

CJRM.  *See* Tab 194, AR27010.  The fact that this contract implicates national defense weighs

against issuing an injunction.  *See* 28 U.S.C. § 1491(b)(3) ("courts shall give due regard to the

interests of national defense and national security").  Furthermore, and as plaintiff concedes, the

CJRM is a significant military staging point in the Pacific.  *See* Pl. Mem. at 2; *see also* Tab 194,

AR27020 (noting that "JRM Guam plays a key role in [] providing logistic and mission support

to the operating forces for all U.S. military forces deployed in the Western Pacific.").  Thus, it is

essential that these services be continued even if the Court were to find merit in DZSP's

complaint.  The current bridge contract with DZSP, however, expires at the end of April 2018.

*See* Pl. Mem. at 39.  DZSP suggests that the Navy simply extend another bridge contract—non-

competitively—to DZSP.  *Id*.  This solution is not without significant problems.  It is not at all

clear that the Navy could justify such sole-source action to DZSP under 10 U.S.C. § 2304(c);

further, to compete the requirement, as amply demonstrated by the history of this procurement, is

no easy undertaking.  *See Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 550-51

(2010) (determining that the harm to the Government from an injunction was as "at least equally

---

[11] While this Court has held that a "lost opportunity to compete" may constitute
irreparable harm—*see*, *e.g.*, *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494
(2013)—such a holding creates a presumption in favor of injunctive relief, which the Supreme
Court held to be impermissible in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391-93
(2006).

as significant[]" to that of the protester where there were concerns regarding the ability of the Air

Force to justify the use of non-competitive bridge contracts).  Moreover, a sole-source

negotiation is not conducive to cost savings.  Tab 192, AR26974 (noting increases in labor costs

under DZSP's bridge contracts).

Accordingly, if injunctive relief is appropriate, the Government believes that such relief

should be limited in a manner that would allow the Navy the discretion to determine the best

means of meeting its requirements, to include allowing Fluor to continue performance under the

awarded contract, while the Navy provides such other relief as the Court would deem

appropriate.  The balance of harms in this case indicates that allowing Fluor to proceed under the

awarded contract, even if the result of an imperfect evaluation, is a better course of action than

yet another award of a non-competitive bridge contract to either DZSP or Fluor.

*Fourth*, the final prong of injunctive relief also weights against an injunction, as the Court

has held that it is in the public interest for "a procuring agency [to] be able to conduct

procurements without excessive judicial infringement upon the agency's discretion." *Aero

Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997) (citation omitted).

**V.      The Court Should Deny DZSP's Motion To Supplement The Administrative Record
         With Documents Related To Its Bridge Contracts And Should Further Strike All
         References To These Documents From DZSP's Brief**

Finally, DZSP seeks to supplement the administrative record with documents related to

its bridge contracts.  *See* ECF No. 38 (Pl. Mot.) at 1.  DZSP has numbered these documents Tabs

216 through 236, AR27509 to AR28558.  *See id.* at 5; *see also* ECF No. 38-1 at 1.  DZSP argues

that these documents are relevant to the Court's review of its claim that the Navy should revise

the solicitation due to changed requirements.  Pl. Mot. at 1-3.  The Court should reject DZSP's

attempt to circumvent the well-established APA standard of review and engage in a *de novo*

review of documents related to DZSP's bridge contracts.

DZSP contends that the Navy should have made a decision to revise the solicitation because, in its view, the Government's requirements have changed over time, as evidenced by DZSP's work on its various bridge contracts.  Pl. Mot. at 1-2.  In *Axiom Resource Management, Inc. v. United States*, the Federal Circuit explained that, in a bid protest, the administrative record documenting the Navy's decision-making process that should generally consist of the documents the agency considered at the time of challenged decision.  564 F.3d 1374, 1379-80 (Fed. Cir. 2009).  Notably, and as explained above, DZSP never requested that the Navy consider revising the solicitation.  *See supra* at II.  Moreover, the Navy did not separately contemplate whether it should do so.  As a result, there is no agency decision on this issue and, by extension, no additional documents that should be included in the administrative record, which documents the **agency's** decision-making process.  In regards to the specific documents that DZSP seeks to include in the administrative record, the Navy did not consider the administration of DZSP's bridge contracts—which are administered in Guam—when evaluating proposals for this procurement resulting in award to Fluor in Hawaii.[12]  Thus, DZSP is in essence asking the Court to engage in an extensive *de novo* review of contract administration documents that did not factor into the Navy's evaluation.  The Court should deny DZSP's motion.

The Federal Circuit has held that, while "supplementation of the record is not completely ruled out … the parties' ability to supplement the administrative record is limited." *Caddell*

---

[12] As explained in the CET's 2017 report, the Navy reviewed the exempt labor rates utilized in DZSP's bridge contracts to help inform the Navy's determination as to whether DZSP's exempt labor rates would remain constant of the life of the contract. *See* Tab 192, AR26974.  However, as we earlier explained, the Navy ultimately used an eight-year average of the Guam CPI before applying a 1.29 escalation rate to DZSP's proposed exempt labor rates. AR26974-26975.

*Constr. Co. v. United States*, 111 Fed. Cl. 49, 93 (2013) (quoting *Axiom Res. Mgmt.*, 564 F.3d at

1379).  In the precedential *Axiom* decision, the Federal Circuit advised that "supplementation of

the record" is "restrictive" and "should be limited to cases in which 'the omission of extra-record

evidence precludes effective judicial review.'"  564 F.3d at 1380 (quoting *Murakami v. United*

*States,* 46 Fed. Cl. 731, 735 (2000), *aff'd,* 398 F.3d 1342 (Fed. Cir. 2005)).  In *Axiom*, "[t]he

Federal Circuit relied on the cases cited by this court in *Murakami* to conclude that '[t]he

purpose of limiting review to the record actually before the agency is to guard against courts

using new evidence to convert the arbitrary and capricious standard into effectively de novo

review.'"  *L-3 Commc'ns EOTECH, Inc. v. United States*, 87 Fed. Cl. 656, 671-72 (2009)

(quoting *Axiom*, 564 F.3d at 1379, 1380) (internal citations and quotations omitted).  Rather, "the

focal point for judicial review should be the administrative record already in existence, not some

new record made initially in the reviewing court."  *Axiom*, 564 F.3d at 1379-80 (citation

omitted).

The Federal Circuit has reiterated the limited nature of supplementation in recent years.

*See*, *e.g.*, *Per Aarsleff*, 829 F.3d at 1310 at fn. 3 (citing *Axiom* and reiterating that the Federal

Circuit "has previously found abuse of discretion where a trial court allowed supplementation of

the record without first making the required determination [of 'whether supplementation of the

record was necessary in order not to frustrate effective judicial review.'"]) (internal citations and

quotation marks omitted); *AgustaWestland N. Am., Inc. v. United States*, No. 2017-1082, 2018

U.S. App. LEXIS 1602, at *9-11 (Fed. Cir. Jan. 23, 2018) (determining that the trial court abused

its discretion in supplementing the administrative record where the existing administrative record

was "sufficient" for the Court "to review the Army's sole-source procurement award[.]").

Here, the Court should reject DZSP's attempt to substitute its judgment for that of Government evaluating officials to determine whether the Navy should have revised the solicitation due to DZSP's work under the bridge contracts—a question the Navy was never even asked to consider.  Within the context of *Axiom* and its progeny, DZSP's request to supplement the administrative record is improper and should be denied.  Similarly, we respectfully request that the Court strike all references to these documents from DZSP's motion for judgment on the administrative record.  *See* Pl. Mem. at 17-21.

## CONCLUSION

For these reasons, the Court should grant our motion for judgment upon the administrative record and deny DZSP's cross-motion for judgment on the administrative record. In addition, the Court should deny DZSP's motion to supplement the administrative record and should further strike all references to these documents from DZSP's brief.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

OF COUNSEL:                                      s/ Veronica N. Onyema
                                                 VERONICA N. ONYEMA
RICHARD J. HUBER, Esq.                           Trial Attorney
PATRICIA J. BATTIN, Esq.                         U.S. Department of Justice
Department of the Navy                           Civil Division
                                                 Commercial Litigation Branch
                                                 P.O. Box 480
                                                 Ben Franklin Station
                                                 Washington, D.C.  20044
                                                 Telephone: (202) 353-0536

February 26, 2018                                Attorneys for Defendant

**<u>CERTIFICATE OF SERVICE</u>**

I certify under penalty of perjury that on this 26th day of February, 2018, a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD, MOTION TO STRIKE, AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD" was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>    s/ Veronica N. Onyema    </u>
VERONICA N. ONYEMA